# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19-cr-00936 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CARMELO FONSECA JR. | ) | |

## MEMORANDUM OPINION AND ORDER

Early one morning in June 2019, Defendant Carmelo Fonseca Jr. was asleep in his bedroom when a team of federal and local law enforcement officers executed a search warrant at the apartment where Fonseca lived with members of his family. After informing Fonseca that he was not under arrest and was free to leave, officers interviewed Fonseca—first in the kitchen, then outside by the building's parking lot, and finally, in a police vehicle. The entire interview lasted a little under two and a half hours. Now, Fonseca seeks suppression of the statements he made to officers during that interview, arguing that the officers failed to provide *Miranda* warnings in violation of the Fifth Amendment. (Dkt. No. 66.) Additionally, Fonseca asks the Court to quash the search warrant for his home and suppress all evidence seized from its execution, contending that the warrant incorrectly described where the apartment was located. (Dkt. No. 72.) For the reasons stated below, both motions are denied.

## BACKGROUND

In considering Fonseca's motions, the Court has relied upon evidence presented at an in-person evidentiary hearing held on October 13, 2021. At the evidentiary hearing, the Government called two witnesses: (1) Federal Bureau of Investigation ("FBI") Special Agent Shannon McDaniel and (2) FBI Special Agent Kassandra Hulliberger. Fonseca called one witness: Officer Veronica Rohman, who at the relevant time was a detective with the Elk Grove Police

Department. Additionally, the Government submitted into the record copies of the application and affidavit for a search warrant (Dkt. No. 74-1) and the consent to assume online identity authorization form Fonseca signed at the end of his interview. (Dkt. No. 74-2.) The following summarizes the evidence relevant to the issues presently before the Court.

On May 29, 2019, a federal magistrate judge issued a warrant to search "the condominium unit located at 107 Boardwalk Street, Unit 1W, Elk Grove Village, Illinois, further described in Attachment A." (Gov.'s Resp. to Mot. to Quash, Ex. 1, Search Warrant Application at 1, Dkt. No. 74-1.) Attachment A includes a description of the premises as well as two photos, one showing the main entrance and one of the exterior. (Search Warrant Application at Attach. A.) The description states:

> The Subject Premises is the condominium unit with the address 107 Boardwalk Street, Unit 1W, Elk Grove Village, Illinois. The building, depicted in the images below, is a three-level brick structure. The Subject Premises is a unit located on the lower level, at the west end of the building.

(*Id.*) In the affidavit supporting the search warrant, Agent McDaniel explains that an individual used an IP address owned by Comcast Communications to send the messages and images subject to the investigation. (*Id.* at 7.) According to Comcast records, the user of the IP address at the relevant times was the Subject Subscriber, with a service address of the Subject Premises. (*Id.*) The affidavit itself does not list the name of the Subject Subscriber, although Agent McDaniel testified at the evidentiary hearing that the Comcast records list "Carmelo Fonseca" as the subject subscriber.[1] Before requesting the search warrant, Agent McDaniel conducted surveillance of the

---

[1] According to Agent McDaniel, she referred to Fonseca as the "subject subscriber" in the affidavit because, at such an early stage in the investigation, law enforcement would not know if the subscriber was the person actually involved in the illegal activity. Given that the records would be eventually unsealed, law enforcement refrained from using an individual's name to avoid implicating someone in an investigation of which they might not actually be the subject.

2

Subject Premises. (*Id.* at 8.) Through that surveillance, she confirmed that mail had been delivered to the Subject Premises for an individual with the last name "Fonseca" and observed that the building entry had a buzzer labeled "Fonseca." (*Id.*)

On the morning of June 4, 2019, a team composed of approximately eleven FBI agents and Elk Grove Village police officers arrived at 107 Boardwalk Street. Agent McDaniel and Agent Hulliberger were dressed in plain clothes but wore FBI vests and had their duty weapons holstered on their duty belts. Other officers were dressed in law enforcement gear. To gain access to the building (and thus be able to knock on Unit 1W's door), Agent McDaniel rang all of the buzzers with the exception of the one labeled "Fonseca." A resident from the lower level of the building answered the door and directed the agents to the middle floor, where Unit 1W was located. At 6:03 a.m., the agents knocked on Unit 1W's door. Fonseca's sister opened the door and let the team in. Fonseca was asleep in his bedroom. Fonseca was escorted from his bedroom to the kitchen.

Approximately seven minutes after entering Unit 1W, at around 6:10 a.m., Agent McDaniel began to interview Fonseca in the kitchen while the rest of the team searched the house. Agent Hulliberger and Officer Rohman were present for the questioning. Agent McDaniel testified that they began the interview by telling Fonseca that the officers were there to execute a search warrant for the premises, they would like to speak to him about the basis for the search warrant, and he was not under any obligation to speak with them. Agent McDaniel could not recall if she ever informed Fonseca that he was not under arrest, but Agent Hulliberger testified that Fonseca was told that he was not under arrest and that he was free to leave.[2] Agent McDaniel took the lead on the interrogation—throughout the questioning, she kept the tone friendly and

---

[2] Officer Rohman could not recall much of her interaction with Fonseca.

3

conversational. Agent Hulliberger testified that at no point was Agent McDaniel threatening or aggressive and that, in fact, Agent McDaniel was patient with Fonseca.

Fonseca, Agent McDaniel, Agent Hulliberger, and Officer Rohman started the interview in the kitchen. All three witnesses agreed that the kitchen was very small, with Agent Hulliberger explaining that there were only two chairs and no table. Fonseca and Agent McDaniel were both seated, while Agent Hulliberger and Officer Rohman were standing nearby. While Agent McDaniel was questioning Fonseca, he asked for water. In response, an officer brought over a glass of water—Fonseca did not get it himself. According to Agent Hulliberger, Fonseca would not have been free to get his own glass. Over the course of the interview, Fonseca was eventually informed about the nature of the investigation and the basis for the search warrant. At that point, Fonseca indicated concern that his nephew would overhear discussions of child pornography and child sex abuse and asked if the interview could be moved from the apartment. The questioning agents agreed, and another officer brought over shoes for Fonseca to wear. According to Agent Hulliberger, for safety reasons, the FBI would not tell Fonseca to go to his bedroom and to get his own shoes but would, instead, ask him where the shoes are located and bring them to him. The agents then moved outside, going out the back entrance of the building, near the parking lot to continue the interview. After a few minutes, Fonseca again asked if they could move somewhere more private, as other people were in the area. The officers again agreed and moved the interview to Agent Hulliberger's vehicle, a Chevy Impala issued by the FBI.

Agent Hulliberger's car was a standard four-door sedan, with no barrier, cage, or other modification for law enforcement use. Fonseca sat in the back seat next to Agent McDaniel (who continued to take the lead in the interview) and behind Agent Hulliberger, who was seated in the driver's seat. Officer Rohman sat next to Agent Hulliberger in the front passenger seat. The car

4

engine was running during the interview and the windows were up, with the air conditioning on. Fonseca claims in in his briefing that the doors of the car were locked during the interview, although none of the witnesses at the evidentiary hearing could clearly recall whether that was the case.[3]

During the interview, Fonseca answered other questions about his social media and internet use, eventually admitting to receiving and distributing some pictures. The tone throughout the interview was conversational. In his briefing, Fonseca claims that when he would ask the officers if they were done questioning him, they would reply that they still had more questions. There is no testimony to support this assertion, however, and Agent McDaniel actually testified that Fonseca never asked "are we done here." Additionally, both she and Agent Hulliberger testified that they did not recall Fonseca ever asking to end the interview. In fact, according to Agent McDaniel, the interview was terminated once Fonseca decided that he wished to end it.

At 8:25 a.m., towards the end of the interview, Fonseca signed a form authorizing the agents to assume his online identity. Fonseca then opened the door and exited the vehicle on his own accord, heading back to his apartment. By that point, the other officers had concluded their search. The law enforcement team left the premises at 8:36 a.m. Months later, on December 18, 2019, Fonseca was arrested and Mirandized.

## DISCUSSION

### I.   Motion to Quash

Fonseca first moves to quash the search warrant on the basis that it failed to satisfy the particularity requirement of the Fourth Amendment. The Fourth Amendment requires that a

---

[3] Both Agent McDaniel and Agent Hulliberger testified that they could not recall whether the doors were locked, while Officer Rohman testified that she did not think the doors were locked.

search warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. The "manifest purpose" of the particularity requirement is to prevent "the wide-ranging exploratory searches" the constitutional framers feared. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Accordingly, this requirement "is satisfied if 'the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended.'" *United States v. McMillian*, 786 F.3d 630, 639 (7th Cir. 2015) (quoting *Steele v. United States*, 267 U.S. 498, 503 (1925)). Thus, while warrants containing "an error or critical ambiguity that risks a search of the wrong location" may violate the Fourth Amendment, "typographical errors or other mistakes will not invalidate a warrant if the affidavit otherwise identifies the targeted premises in sufficient detail and there is no chance that another location might be searched by mistake." *Muhammad v. Pearson*, 900 F.3d 898, 904 (7th Cir. 2018). The particularity requirement is not, however, "intended to protect against the error . . .where a warrant supported by probable cause fails to reflect the precise floor plan of the premises to be searched." *United States v. Kelly*, 772 F.3d 1072, 1081 (7th Cir. 2014).

Fonseca contends that the search warrant is rendered unconstitutional by the fact that the description of the Search Premises included in the supporting affidavit describes the unit as being "located on the lower level," when, in actuality, Unit 1W is located on the middle level. Fonseca argues that this conflicting information made it impossible for officers to determine which unit to search. This argument assumes, however, that the officers would have no way to determine which information, between the unit number and the apartment level, was correct. Yet "officers executing a search warrant can rely on what they know and see independent of the documents to make sure they search the correct premises." *Muhammad*, 900 F.3d at 905. And here, the officers executing the search warrant knew that the warrant was authorized based on records tying a

6

Comcast account to Unit 1W. In fact, officers discovered that Unit 1W was not on the lowest level only after asking the resident who buzzed them in to direct them to Unit 1W. Put simply, the mere fact that the more detailed description of the Subject Premises attached in the affidavit was incorrect as to the level of the unit clearly did not result in any confusion among the officers when executing the warrant—at all points, they knew that the target of their search was Unit 1W.[4]

For this reason, the Court denies Fonseca's motion to quash the warrant and suppress all evidence found as a result of the search.

### II. Motion to Suppress Statements

Fonseca next contends that any statements made during his interview must be suppressed because he was subject to a custodial interrogation without being informed of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* dictates that "a suspect interrogated by law enforcement officers while in custody must be notified of his constitutional rights to counsel and against self-incrimination." *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007) (citing *Miranda*, 384 U.S. at 444). Consequently, an individual "must be both 'in custody' and 'subjected to interrogation'" for *Miranda* warnings to be required. *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006). Here, the Government does not dispute that Fonseca was subject to interrogation by law enforcement (specifically, questioning primarily by Agent McDaniel) or that he was never informed of his rights as required by *Miranda*. Thus, the critical determination is whether Fonseca was in custody at the time of his interrogation.

---

[4] Although the search warrant itself did not list the name of the Comcast subscriber, the officers were aware that the subscriber to that Comcast account had the last name "Fonseca." Indeed, prior to applying for the search warrant, Agent McDaniel conducted surveillance and confirmed that there was a buzzer entry with the last name of the subscriber (Fonseca) at the building. Then, when executing the search warrant, Agent McDaniel buzzed every buzzer for residents in the building ***except*** for Fonseca's. And Fonseca's name, of course, was associated specifically with Unit 1W.

For a suspect to be in custody for *Miranda* purposes, there must be a "formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012). In other words, courts must decide "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Pelletier*, 700 F.3d 1109, 1114 (7th Cir. 2012) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). In making this determination, courts conduct two inquiries: "(1) what were the circumstances surrounding the interrogation; and (2) would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Ambrose*, 668 F.3d at 954–55 (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011)). Courts consider the totality of the circumstances when conducing the second inquiry. *Thompson*, 496 F.3d at 810. In so doing, courts may look to "the location of the questioning, its duration, statements made during the interrogation, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning." *United States v. Borostowski*, 775 F.3d 851, 859 (7th Cir. 2014) (citing *Howes*, 565 U.S. at 509). Other factors considered in the analysis include what the officers told the individual—such as whether he was told he was not under arrest and was free to leave—whether officers moved the individual to another area, the number of officers and the presence of a display of weapons or use of physical force, and the officers' tone of voice. *United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011). Here, Fonseca asserts that he was in custody for the entirety of his interrogation, which took place in three locations: the kitchen, the parking lot, and the car. The Court addresses the custody determination for each location in turn.

First, the Court finds that Fonseca was not in custody while he was being interviewed in either the kitchen or outside in the parking lot. Although the kitchen was small, such that Fonseca

8

was in close proximity to the officers, this alone is not enough to support a finding of custody. *See Thompson*, 496 F.3d at 811 (noting that the mere fact that a small space in a home requires agents to sit within a few feet of an individual is not, without other custodial indications, enough to render a suspect in custody). While Fonseca makes much of the fact that he was unable to move freely about his own home, as evidenced by the facts that he felt as though he had to request permission to get a glass of water and that he was not allowed to retrieve his own shoes to put on before heading outside, "in the usual case, a person detained during the execution of a search warrant is not 'in custody' for purposes of *Miranda*." *United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994). Moreover, by Fonseca's own account, any such detention in his home was short, only a few minutes—after all, he argues that he spent over two hours (of an interview lasting two hours and fifteen minutes) in the car, not in the kitchen. In other words, the fact that Fonseca was not offered unfettered freedom of movement within his home while officers conducted a search is not, on its own, enough to render him in custody. *See United States v. Valley*, 755 F.3d 581, 583, 585–86 (7th Cir. 2014) (noting that the defendant was not in custody where he was handcuffed for ten minutes while a house was secured during the execution of a search warrant, after which he was uncuffed). And Fonseca does not meaningfully contest that he was not in custody while he spoke with the agents outside the building by the parking lot.

Fonseca asserts, however, that at the very least he was in custody once he was placed in the back seat of Agent Hulliberger's vehicle. After all, Fonseca was in an enclosed space, surrounded by three armed officers, and, as Fonseca emphasizes, he was questioned for approximately two hours in the car.[5] Courts should consider the duration of the interview when

---

[5] The Court notes that the exact length of time Fonseca spent in the car is unclear. In his briefing, Fonseca suggests that the majority of the interview, over two hours, was conducted in the car. The Government, however, contends that the interview was moved from the kitchen after approximately twenty minutes, after which Fonseca spent a couple minutes talking by the parking lot before asking to move locations.

conducting the custody analysis. *United States v. Leal*, 1 F.4th 545, 552 (7th Cir. 2021) (holding that the "short duration of the interview—less than 20 minutes—weigh[ed] against a finding of custody"). But two hours, while a considerable time, is not so lengthy as to weigh strongly in favor of a finding of custody. *See, e.g.*, *Stechauner v. Smith*, 852 F.3d 708, 715–16 (7th Cir. 2017) (holding that "reasonable jurists could conclude" the defendant was not in custody even where the defendant was confined to a hospital bed and not told that he was free to end the conversation because the duration of questioning—ninety minutes—was "relatively short," the officers did not use handcuffs or other restraints, and there was no other indication of coercion).

      Most importantly, courts must consider the *totality* of the circumstances to determine whether an individual was in custody. Here, that includes the sequence of events that resulted in Fonseca being interviewed in the back of the car. Critically, Fonseca twice requested that the agents change the location of the interview—first from the apartment (to prevent his family members from overhearing questions about child pornography) and then from the parking lot (to move out of sight of his neighbors and the general public). And twice, the agents acquiesced. This indicates that not only did Fonseca have some control over the situation but also that he was aware that he could exercise his right to dictate terms of the conversation. While Fonseca makes much of the fact that he did not suggest Agent Hulliberger's car as a suitable location, he also does not claim that he requested *not* to continue the conversation there and proposed somewhere else. Given that the agents had just twice obliged to his requests to talk elsewhere, there is no apparent reason why he would not feel free to do so again and Fonseca fails to provide one. Furthermore, the agents all testified at the evidentiary hearing that Fonseca would have been free to leave the

---

Given that the parties agree that the interview was conducted from 6:10 a.m. to 8:25 a.m., or two hours and fifteen minutes, the Government's version suggests that Fonseca spent under two hours in the car.

conversation at any point—indeed, they testified that the interview ended upon his request. Put simply, the mere fact that the interview took place in a car issued by law enforcement to accommodate Fonseca's own desire, does not, without more, result in a custodial situation.

Moreover, other factors beyond the location of the interview weigh against a finding of custody. While the length of the interview points in favor of a custody determination, other considerations do not. *United States v. Littledale* is instructive. 652 F.3d 698 (7th Cir. 2011). There, the defendant was interviewed in a private office, doors shut, at the campus police station because the agents wanted to avoid discussing child pornography in front of the defendant's peers at school. *Id.* at 700. Applying the relevant factors, the Seventh Circuit noted that the defendant in *Littledale* had consented to being interviewed, the officers used a monotone tone of voice, there was no physical touch or display of force beyond the fact that the officers carried holstered weapons, the defendant was assured that he was not under arrest (although he was not told he was free to leave), and the defendant was brought to a more private space to prevent discussing a sensitive topic in front of his classmates. *Id.* at 702. Given these factors, the mere fact that the interview took place at the campus police station was "not dispositive." *Id.*

Similarly, here, the agents maintained a conversational tone of voice throughout the interview, none of the officers physically restrained Fonseca or displayed their weapons in a show of force, Fonseca was explicitly informed at the beginning of the interview that he was free to leave, and, in fact, Fonseca terminated the interview and exited the vehicle of his own accord. Fonseca was not even arrested that day—he was arrested six months later, in December 2019. *See, e.g.*, *United States v. Patterson*, 826 F.3d 450, 458 (7th Cir. 2016) (noting that the fact that the defendant left after interrogation and was not immediately arrested weighs against a custody finding). Moreover, unlike in *Littledale*, it was Fonseca, not the agents, who suggested moving to

11

a more private location—in other words, Fonseca had even more control over the location of the interview.

To support a custody determination, Fonseca compares his situation to that in *Sprosty v. Buchler*, where, after describing the custody determination for purposes of *Miranda* as a "close question," the Seventh Circuit found that the defendant was in custody. 79 F.3d 635, 641, 643 (7th Cir. 1996). There, the defendant (who was outside his home when officers arrived) was barred in the path by officers and escorted inside, where he was then read his *Miranda* rights and placed under armed guard for nearly three hours and subjected to persistent accusatory questioning. *Id.* at 642–43. Unlike in *Sprosty*, however, the agents interviewing Fonseca did not observe certain formalities of a custodial arrest and, far from being escorted inside, Fonseca was allowed to move outside to continue the interview at his own request.

*Borostowski*, upon which Fonseca similarly relies, is also inapposite. Although Fonseca relies on *Borostowski* for the proposition that an individual can still be in custody even when interrogated in a familiar surrounding (there, a small bedroom in his parents' home) and where the tone of questioning was never combative or hostile, the Seventh Circuit's determination of custody rested on facts not present here. *Borostowski*, 775 F.3d at 860. Specifically, the Seventh Circuit noted that the interrogation began with an "overwhelming display of force." *Id.* Indeed, the defendant was originally handcuffed and physically pulled outside, where he was forced to wait for twenty to twenty-five minutes in cold temperatures without proper attire and, while the handcuffs were eventually removed after he was taken into the bedroom, the defendant remained within arms-reach of agents for the next three hours. *Id.* at 861. Put simply, the circumstances around Fonseca's interrogation were significantly less restrictive—beyond the mere fact of a team

of officers arriving at Fonseca's home, he was never subject to such a show of force or authority, and was never physically restrained.

Taking all of the factors into account, the Court concludes that a reasonable person would have felt free to leave. Accordingly, because Fonseca was not in custody at the time of his interrogation, his motion to suppress must be denied.

## CONCLUSION

For the reasons given above, Fonseca's motion to suppress statements (Dkt. No. 66) and motion to quash warrant and suppress statements (Dkt. No. 75) are denied.

Dated: April 15, 2022

                                                                                  _____
                                                                                  Andrea R. Wood
                                                                                  United States District Judge